**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

ADONIS MARIE CALDWELL,

      Plaintiff,

v.                                Case No.: 3:09-cv-00777

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

      Defendant.

**<u>MEMORANDUM OPINION</u>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration denying plaintiff's application for Period of Disability, Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433 and 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (Docket Nos. 13 and 15). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 10 and 11).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I. <u>Introduction</u>

Plaintiff, Adonis Marie Caldwell  (hereinafter "Claimant"), filed applications for DIB and SSI on September 27, 2004, claiming that she had been disabled since May 5, 2003 due to "irritable bowel syndrome, bone spur on bottom of back, lack of education,

nerves." (Tr. at 14 and 91). The Social Security Administration (SSA) initially denied the claims on March 17, 2005 and, upon reconsideration, again denied them on November 22, 2005. (Tr. at 14).  Thereafter, Claimant filed a written request for a hearing, which was conducted on April 2, 2007 by the Honorable Andrew J. Chwalibog, Administrative Law Judge (hereinafter "ALJ").  (Tr. at 399-418).  A supplemental hearing was held on June 2, 2007 for the purpose of reviewing an evaluation of Claimant requested by the ALJ after the first hearing.  (Tr. at 419-426).   By decision dated October 22, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-25).  The ALJ's decision became the final decision of the Commissioner on May 7, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 6-8).  Claimant timely filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g).  (Docket No. 2).

## II.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.   In *Blalock v. Richardson,* 483 F.2d 773 (4th Cir. 1972), the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, *supra* at 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The Court does not decide *de novo* "whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing

*Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001). In conducting its review, the Court is not charged with re-weighing evidence or resolving conflicts in the record.  Instead, its function is limited to scrutinizing the totality of the record to determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock v. Richardson, supra* at 775*.*

A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

III.   **The Decision of the ALJ**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See *Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months" 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. §§ *Id.* 404.1520(a), 416.920(a).

The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the

impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(e), 416.920(e).

By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). That section provides as follows:

c) *Rating the degree of functional limitation.*

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation.  A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities.  20 C.F.R. § 404.1520a(d)(1).  Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe

impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(2).

In this case, the ALJ found that Claimant satisfied the first step of the sequential evaluation, because she had not engaged in gainful activity since the date of the alleged onset of disability. (Tr. at 16, Finding No. 2). Turning to the second step, the ALJ determined that Claimant had the following severe impairments: chronic pain syndrome; chronic obstructive pulmonary disease ("COPD"); and irritable bowel syndrome ("IBS"). (Tr. at 16-18, Finding No. 3). The ALJ acknowledged Claimant's additional medically determinable conditions of chest pain and psychiatric distress in the form of anxiety and depression, but did not find these conditions to be severe. *Id.* The ALJ indicated that cardiac testing on the Claimant had revealed the absence of significant cardiac dysfunction and coronary disease. *Id.* In addition, employing the

special technique, the ALJ found that Claimant's generalized anxiety disorder was non-severe, noting that she experienced no more than a "mild" degree of limitation in the first three broad functional categories and had no episodes of decompensation. *Id.*

The ALJ next analyzed Claimant's impairments, separately and in combination, and concluded that they did not meet or medically equal any of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). (Tr. at 18-19, Finding No. 4). He concluded that Claimant had the residual functional capacity (hereinafter "RFC") to perform a range of light level work activities, limited by the following:

> limited to light exertional lifting/carrying of no more than fifty pounds maximum occasionally and twenty-five pounds maximum frequently; stand three hours out of eight, two hours without interruption; walk two hours out of eight, one hour without interruption; sit four hours out of eight, two hours without interruption; no overhead reaching; occasional handling; frequent fingering bilaterally; no more than occasional push/pull with the upper extremities; and avoidance of concentrated exposure to temperature extremes, humidity, smoke, fumes, odors, dust, and pollutants, or hazardous machinery and unprotected heights. The claimant further has eighth grade reading abilities; fifth grade math abilities, and third grade spelling.

(Tr. at 19, Finding No. 5). As a result, Claimant could not return to her past relevant employment as a waitress and housekeeper, which were classified by the vocational expert at the administrative hearing as light exertional semi-skilled work and medium exertional semi-skilled work, respectively. (Tr. at 23, Finding No. 6). Nevertheless, the ALJ considered Claimant's age, education, work experience and RFC, as well as the testimony of the vocational expert, and determined that Claimant could perform jobs such as production inspector and routing clerk, which existed in significant numbers in the national economy. (Tr. at 24, Finding No. 10). On this basis, the ALJ found that the

plaintiff was not disabled, as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 25, Finding No. 11).

**IV.**   **Claimant's Challenges to the Commissioner's Decision**

Claimant alleges that the ALJ committed two errors and the Appeals Council committed a third error, any one of which would justify a reversal of the Commissioner's decision and a remand under sentence four of 42 U.S.C. §405(g).   First, Claimant asserts that the ALJ erred by failing to recognize Claimant's borderline intelligence level as a severe impairment.  Second, Claimant contends that the ALJ failed to include all of the limitations associated with her severe impairments in the hypothetical questions he posed to the vocational expert.  (Pl. Br. at 10-17).   Finally, Claimant argues that the Appeals Council either failed to address the additional evidence submitted by Claimant after the ALJ's written decision—in particular, a functional assessment by Claimant's treating physician that documented limitations considerably more severe than those relied upon by the ALJ—or failed to articulate its reasons for apparently discounting that evidence.  (Pl. Br. at 18-19).

In response, the Commissioner posits that the ALJ accounted for the limitations associated with Claimant's borderline intelligence level in his assessment of RFC and his hypothetical questions to the vocational expert; accordingly, the ALJ's failure to expressly acknowledge Claimant's I.Q. as a severe impairment is, at most, harmless error.  (Def. Br. at 10-11).  Furthermore, the Commissioner argues that the hypothetical questions posed by the ALJ included the limitations associated with all of Claimant's severe impairments; therefore, the questions fully complied with the social security regulations.  (Def. Br. at 11-13).  Finally, the Commissioner contends that the Appeals Council is not required to articulate reasons for rejecting evidence, and, in any event,

this Court does not have jurisdiction to review the Appeals Council's action, because it did not constitute a final agency decision subject to judicial review. (Def. Br. at 13-18).

## V.   Claimant's Background and Relevant Medical Records

Claimant was born in 1954 and was 52 years old at the time of the administrative hearing. (Tr. at 79 and 403). She completed the ninth grade, dropping out of school in the tenth grade. She did not obtain a GED. (Tr. at 404). In the eighteen years prior to her alleged disability onset date, Claimant had worked as a waitress and in an office providing cleaning services. (Tr. at 92). Claimant could read, speak, and understand English and do simple mathematics. (Tr. at 404). She originally stopped working to care for her terminally ill mother, but alleged that her health problems precluded her from returning to work. (Tr. at 91-92).

The medical evidence considered by the ALJ included records that pre-dated and post-dated the disability onset date; that being, May 5, 2003. The Court has reviewed all of the evidence in its entirety, including these medical records, but will only comment on records relevant to the disabilities alleged by Claimant or determined by the ALJ.

### A.   Treatment Records Pertaining to the Severe Impairment of IBS.

Irritable Bowel Syndrome is a disorder characterized by cramping, abdominal pain, bloating, constipation and diarrhea.[1] According to the NIDDK, researchers have yet to discover any specific cause for IBS, and the intensity and frequency of the symptoms vary greatly from one sufferer to the next. No test exists to diagnose IBS, so the diagnosis is often made by ruling out other potential medical conditions through laboratory and radiological studies. Most people can control their symptoms by taking

---

[1] National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK"), National Institutes of Health, Publication No. 07-693, September 2007.

medicines such as laxatives, antidiarrhea medicines, antispasmodics, and antidepressants; reducing stress; and changing their diet.[2]   IBS was the medical condition from which Claimant subjectively alleged the most functional limitation.  (Tr. at 130-137).

The first record in evidence relevant to Claimant's IBS was a report of an abdominal x-ray performed on July 28, 1999 at St. Mary's Medical Center ("SMMC") upon the order of Dr. Janet Wallace.  (Tr. at 269).  According to the records, Dr. Wallace was Claimant's primary care physician during the years of 1999-2003.  The x-ray was reported as normal for bony structures, soft tissues, and bowel gas pattern.  *Id.*  In conjunction with this film, Dr. Wallace ordered a barium enema study, which Claimant completed the following day.   (Tr. at 268). A double contrast barium study was performed, which was interpreted to be normal, without masses, mucosal abnormalities or other significant findings.  *Id.*

On June 6, 2000, Claimant consulted for the first time with Dr. Richard Mailloux, a gastroenterologist practicing with Huntington Internal Medicine Group. (Tr. at 168-170).  Dr. Mailloux noted that Claimant had been referred to him by Dr. Wallace for complaints of diarrhea that had existed for twenty years, but had worsened over the past one to two years.   *Id.*  Claimant complained of constant diarrhea, intermittent left-sided and right lower quadrant pain, and weight loss.  *Id.*  Her prior work-up by Dr. Wallace had included stool studies, a complete blood count, complete chemistry profile, and barium enema, all of which were "nonrevealing."   *Id.*   Dr.

---

[2] National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK"), National Institutes of Health, Publication No. 07-693, September 2007.

Mailloux suggested performing a small bowel follow through study and recommended that Claimant take fiber supplements and avoid dairy products.  *Id.*

The small bowel follow through study was performed on June 9, 2009 and was normal except for a "marginally accelerated transit time."  (Tr. at 167).  Based upon the results of the study, as well as her prior negative test results, Dr. Mailloux reached a presumptive diagnosis of IBS.  *Id.*  He placed Claimant on medication and a fiber supplement and told her to return in one month.  *Id.*  When Claimant returned in July, 2009, she advised Dr. Mailloux that the medication had significantly improved her diarrhea, although she continued to have intermittent left upper quadrant pain that moved to the right and was severe.  *Id.*  Dr. Mailloux ordered CT scans of the abdomin and pelvis. Claimant underwent CT scanning on August 2, 2000.  (Tr. at 164).  The abdominal scan was unremarkable, and the pelvic scan showed the presence of ovarian cysts.  Otherwise, that film was normal as well.  *Id.*

Claimant's final visit with Dr. Mailloux was on December 28, 2000.  (Tr. at 163).  At that time, she reported that she had done well over the last six months on the medication and fiber supplements, having only one severe episode of abdominal pain in the interim.  *Id.*  Dr. Mailloux's impression was "irritable bowel syndrome, stable."  *Id.*

Claimant next complained of symptoms related to IBS to Dr. Wallace on September 25, 2002.  (Tr. at 173).  She told Dr. Wallace that she still had problems with IBS, "with flare-ups off and on," that were "worse with increased stress secondary to her mother's illness."[3]   *Id.*   Dr. Wallace recommended that Claimant continue using Citrucel, decrease her caffeine intake, and avoid dairy products.

---

[3] Claimant's mother was diagnosed with cancer.

On March 19, 2003, which apparently was Claimant's final visit with Dr. Wallace, Claimant was complaining of low back pain radiating to the back of her left leg.  (Tr. at 172).  She told Dr. Wallace that her tailbone hurt when she sat on it.  She denied any injury.  *Id.*  Claimant also denied bowel and bladder problems.  Her abdominal examination was normal.  *Id.*  Dr. Wallace referred Claimant to Dr. Robert Nease for chiropractic care.  Dr. Nease did not provide any care to Claimant related to her IBS. (Tr. 183-185).

On December 3, 2003, Claimant replaced Dr. Wallace as her primary care physician with Dr. Sangeeta Patil, an internal medicine specialist.  (Tr. at 265-267).  In her initial visit, she told Dr. Patil that she was "relatively healthy," except for IBS.  She described her symptoms as "predominantly diarrhea and bloating," although she expressed no complaints of those problems at that particular time.  *Id.*  Claimant saw Dr. Patil on six occasions in 2004.  (Tr. 257-264).  She mentioned diarrhea on only one occasion, September 28, 2004.  On this visit, the notes indicate that Dr. Patil discussed "chronic diarrhea" with Claimant, although there is no specific documentation regarding the frequency or intensity of her symptoms.  *Id.*  Dr. Patil recommended a colonoscopy in view of her family history of colon cancer.  *Id.*

In 2005, Claimant presented to Dr. Patil's office on three occasions. (Tr. at 254, 256, and 320).  On the first visit, January 31, 2005, Claimant advised Dr. Patil that she had not had the scheduled colonoscopy, because she had applied for disability and believed the SSA might order one.  *Id.*  Dr. Patil noted a history of chronic diarrhea, but did not document any new symptoms or episodes.  *Id.*

In 2006, Claimant visited Dr. Patil's office on seven occasions.  (Tr. 310-318). Only once did she complain of symptoms related to IBS.  On June 22, 2006, Claimant

complained of tenderness in the epigastric region, although this was not her primary complaint.  (Tr. at 312).  She told Dr. Patil that her brother had died in a motor vehicle accident.  She displayed a depressed affect.  *Id.*   Dr. Patil did not treat the abdominal pain on this visit and did not recommend any further studies related to Claimant's IBS. *Id.*

The records in evidence documenting Claimant's treatment by Dr. Patil in 2007 do not reflect that Claimant had any changes or exacerbations of her IBS.  (Tr. at 352-353).

**B.     Treatment Records Pertaining to the Severe Impairment of Chronic Pain Syndrome.**

The first record documenting musculoskeletal pain was created by Dr. Wallace on March 19, 2003.  (Tr. at 172).  Claimant advised Dr. Wallace that she had low back pain that radiated into her left leg when she stood and pain in her tailbone upon sitting.  *Id.* She denied any accident or injury.  Dr. Wallace told her to start Motrin 800 mg, wrote a prescription for Flextra DS, and referred her to Dr. Robert Nease, a chiropractor.  *Id.*

Claimant began treatment with Dr. Nease on March 20, 2003 and continued receiving care from him until August 11, 2003.  (Tr. 183-302).  At her first appointment, Claimant advised Dr. Nease that her back pain started on March 16, 2003 and became worse when she worked.  (Tr. at 198).  Dr. Nease performed a complete chiropractic evaluation and ordered an x-ray read by a chiropractic radiologist, Dr. Craig Church. Dr. Church's impression was spondylosis at the L2 through L4, with marginal osteophyte formation.   (Tr. at 203).    Dr. Nease's diagnosis was sciatica, lumbar radiculitis, and "sub L5."  (Tr. at 201).   Over the course of the ensuing five months,

Claimant received thirty-five adjustments from Dr. Nease without discernible decrease in her subjective complaints.  (Tr. 183-197).

In May, 2003, Dr. Nease ordered an MRI of the lumbar spine, after Claimant complained that her symptoms were worse.  (Tr. at 193-194).  The MRI was performed at Tri-State MRI and was read as a "normal MRI of the lumbosacral region."  (Tr. at 204).  In fact, the radiologist commented that the vertebral bodies and the disc spaces were of normal signal intensity, and there was no evidence of significant bulging annulus or HNP (herniated nucleus pulposus).  *Id.*

In June, 2003, Dr. Nease referred Claimant to Associated Physical Therapists, Inc. for Claimant's complaints of pain in her left lumbosacral region, left buttock, medial thigh, and lateral aspect of her left calf.  (Tr. 186-189).  At the initial evaluation, therapist Marj Weigel opined that Claimant's rehabilitation potential was good. *Id.*  She recommended six weeks of therapy, with sessions as often as three times per week.  (Tr. at 188-189).  Ms. Weigel actually discharged Claimant on July 27, 2003, after a total of seven sessions.  She indicated that Claimant had improved and was anticipating a return to work on July 1, 2003.  (Tr. at 186).

Claimant next complained in earnest about musculoskeletal pain in November 2005.  On November 30, 2005, Claimant complained to Dr. Patil of severe shoulder pain that had been present for two months.  (Tr. at 320).  On examination, Dr. Patil found that Claimant was tender over the right scapular region with decreased grip in her right hand.  Dr. Patil diagnosed a "probably frozen shoulder-right" and referred Claimant for an MRI.  *Id.*  The MRI was performed on December 8, 2005 and revealed a "mild suprasinatus tendinopathy probably related to mild impingement from Type III acromion with some inferolateral tilt; mild AC joint arthropathy with some inferior

fibrous overgrowth appeaing to contact supraspinatus near myotenicous junction with possibly mild impingement here." (Tr. a 303). On April 27, 2006, an x-ray of Claimant's shoulder revealed no acute bony or joint abnormalities, but confirmed the presence of osteoporosis. (Tr. at 327). Throughout 2006, Claimant continued to have problems related to shoulder pain. (Tr. 310-317).

On May 16, 2006, Claimant consulted with Dr. Stanley Tao, an orthopedic surgeon with Scott Orthopedics, regarding the right shoulder pain. (Tr. at 305-307). Dr. Tao performed a physical examination, noting that Claimant had a limited range of motion of the right shoulder due to pain. She had tenderness of the bicipital groove, subacromial space, and trapezium muscle. *Id.* He diagnosed adhesive capsulitis[4] and suggested an injection, physical therapy, and possible manipulation under anesthesia. Claimant agreed to receive the injection and proceed with physical therapy.

Claimant returned to Dr. Patil on January 25, 2007. (Tr. at 352). She told Dr. Patil that her shoulder pain was a little better. She had not received the physical therapy suggested by Dr. Tao, because she could not afford it. *Id.* According to the last record in evidence from Dr. Patil, Claimant continued to have some problems with musculoskeletal issues at her visit in February 2007. (Tr. at 353).

**C.    Treatment Records Pertaining to the Severe Impairment of Chronic Obstructive Pulmonary Disease ("COPD").**

The records reflect that Claimant complained of shortness of breath in 2004. A chest film revealed hyperinflation of the lungs, raising the possibility of COPD. (Tr. at 262). She developed concomitant chest pain in 2005, prompting Dr. Patil to order a CT

---

[4] Adhesive capsulitis, or "frozen shoulder," is a condition in which the ligaments that hold the shoulder bones to each other become inflamed, causing pain and restricting movement of the shoulder. Most of the time, there is no identifiable cause for the inflammation. A.D.A.M.; MedlinePlus, National Institutes of Health.

scan of the chest in January 2006.  (Tr. at 317).   The scan revealed the presence of benign-appearing pulmonary nodules.  Dr. Patil then ordered a PET scan, which was negative for evidence of malignancy, but was suggestive of COPD.  *Id.*  Claimant underwent pulmonary function studies in February 2006, which were diagnostic of chronic airway obstruction.   (Tr. at 316).   Dr. Patil recommended that Claimant quit smoking.   (Tr. at 315).   She prescribed Albuterol, a bronchodilator, and a nicotine inhaler.   *Id.*  A follow-up film performed in April 2006 demonstrated stable pulmonary nodules and "post-inflammatory scarring in the right and left lung apex."  (Tr. at 329). Claimant continued to experience some difficulties with shortness of breath and chest pain, but her subsequent radiological tests confirmed that the pulmonary nodules were stable, with no evidence of new masses or pleural effusions.  (Tr. at 323 and 349).

### D.   Treatment Records Pertaining to Claimant's Non-Severe Impairments.

Claimant alleged impairments of coronary disease and "nerves."  The records indicate that Claimant began to suffer from anxiety when her mother was diagnosed with cancer.   (Tr. at 266).   In addition, the symptoms seemed to be related to peri-menopause.  *Id.*  When her mother, and then her brother died, she also experienced situational depression.   (Tr. at 263 and 312).   Dr. Patil diagnosed Claimant with Anxiety Disorder, but there is nothing in the record to suggest that Dr. Patel referred Claimant for psychotherapy, or prescribed additional medications to specifically address her anxiety.   (Tr. at 263-264).   Claimant already received Elavil, an anti-depressant, as adjutant therapy for her IBS.  Claimant was never hospitalized for psychiatric-related symptoms and reported no particular episodes of decompensation.

In regard to Claimant's cardiac complaints, Dr. Patil ordered a stress myoview on Claimant, which was completed on July 13, 2006.  That study was interpreted as a normal myoview with "normal LV function."  (Tr. at 309).  An exercise stress test done at the same time was also normal.  (Tr. at 308).  Claimant's cholesterol level was borderline high, but her triglycerides, HDL and LDL were not particularly worrisome. (Tr. at 332).  The records do not reflect any treatment by a cardiologist.

### E.    Evaluations by Agency Sources

### 1.    <u>December 19, 2004</u>

The West Virginia Disability Determination Section sent Claimant to Lisa Tate, M.A. for a psychological evaluation.  (Tr. 205-209).  Ms. Tate conducted a clinical interview and a mental status examination.  Claimant advised Ms. Tate that her chief complaints were "nerve problems, lack of education, and medical problems."  (Tr. at 205).  Claimant reported that she had suffered from problems with her nerves "for as long as she can recall," and her symptoms had worsened over time.  She identified her symptoms as "excessive worry, shakiness, feeling as if she wants to cry."  (Tr. at 206). She denied any mental health treatment.  Claimant also reported that she dropped out of school in the tenth grade.  *Id.*  She indicated that she repeated the second grade and made failing grades.  She confirmed that she could read slowly, but stated that she was unable to spell.  She admitted to managing the household finances.  *Id.*

At the conclusion of her evaluation, Ms. Tate diagnosed Claimant with Generalized Anxiety Disorder.  (Tr. at 208).  Ms. Tate further indicated that borderline intelligence could not be ruled out, but could also not be diagnosed in the absence of intelligence testing.  *Id.*  She felt that Claimant's social functioning, persistence and pace

were all within normal limits and that Claimant's concentration was mildly deficient. (Tr. at 209).

### 2.   <u>January 14, 2005</u>

Dr. Drew Apgar, a family medicine specialist, performed a physical examination of Claimant at the request of the SSA.  (Tr. at 211-227).  Claimant told Dr. Apgar that her biggest problem was IBS with occasional fecal incontinence.  (Tr. at 212).  She also reported suffering from anxiety and depression and a lack of education.  *Id.*  Dr. Apgar performed a thorough examination with an emphasis on musculoskeletal and neurological assessments.  He noted that Claimant had no significant compromise of her range of motion and displayed no signs of joint abnormality.  (Tr. at 221-222).  Her grasp was intact bilaterally; her muscle strength was normal; and she could perform rapid alternating hand movements without difficulty.  *Id.*  Dr. Apgar confirmed that Claimant had COPD, with wheezing and poor air movement.  He recommended pulmonary function studies to further evaluate the COPD.  *Id.*  Dr. Apgar saw no evidence of cardiac illness.  He found that Claimant had limitations associated with her lack of education and her occasional fecal incontinence.  *Id.*

### 3.   <u>February 18, 2005</u>

Lisa Tate administered the Wechsler Adult Intelligence Scale-III and the WRAT to Claimant.  (Tr. 228-230).  Ms. Tate determined that Claimant had a verbal IQ of 84, a performance IQ of 77, and a full scale IQ of 79.  The results of the WRAT-3 revealed that Claimant was able to read at an 8th grade level; spell at a 3rd grade level; and perform arithmetic at a 5th grade level.  *Id.* Ms. Tate verified that these results were valid, and the placed Claimant at the borderline level of intellectual functioning.  *Id.*

### 4.    __March 4, 2005__

Frank Roman, Ed.D., a non-examining source, completed a Psychiatric Review Form based upon the available testing.  (Tr. 232-244).  He found that Claimant suffered from the organic mental disorder of borderline intellectual functioning and an anxiety-related disorder, both of which were non-severe.  (Tr. at 232).  Under the "B" Criteria of the pertinent listings in Appendix 1, Dr. Roman determined that Claimant was mildly restricted in activities of daily living, social functioning, and maintenance of concentration, persistence and pace.  He found no episodes of decompensation. (Tr. at 242).   Dr. Roman noted that no evidence existed to establish the presence of "C" Criterion.    (Tr. at 243).   Dr. Roman questioned Claimant's credibility, stating "allegations are in excess of findings on MER."  (Tr. at 244).

### 5.    __March 14, 2005 and November 4, 2005__

The SSA requested Physical Residual Functional Capacity Assessment from two non-examining consultants.  (Tr. at 246-253 and 279-286).  The first consultant[5] found Claimant exertionally limited to standing, walking or sitting six hours out of an eight hour workday, with a lifting limitation of 25 pounds frequently and 50 pounds occasionally.  (Tr. at 247).  In addition, the consultant found some mild limitations in environmental exposures related to Claimant's COPD.  (Tr. at 250).

The second consultant, Dr. Rogelio Lim, assessed Claimant as having the same exertional limitations as did the first consultant. (Tr. at 279-286). However, Dr. Lim found no other limitations, including no environmental exposure restrictions, indicating that the Claimant's lungs were clear and her physical findings were normal.  (Tr. at 284).  He also questioned Claimant's credibility.  *Id.*

---

[5] The Court is unable to identify the name of this consultant from the records in evidence.

### 6.   **November 19, 2005**

Dr. James Binder, a non-examining psychiatrist, completed a Psychiatric Review Form.  (Tr. at 287-300).  His findings mirrored those of Dr. Roman.  *Id.*

### 7.   **March 18, 2007**

After the initial administrative hearing, the ALJ requested that Dr. Drew Apgar complete an updated physical examination on Claimant.  (Tr.  at 354-379).   Dr. Apgar noted that Claimant's disability request was based upon the original complaints of IBS and bone spur on back, but now included the additional medical conditions of COPD, osteoporosis, heart problems, sleep problems, migraine headaches, and hot flashes.  *Id.* After completing his examination and reviewing the relevant records, Dr. Apgar concluded that Claimant suffered from Chronic Pain Syndrome; chest pain; COPD; osteoarthritis; insomnia; and IBS.  (Tr. at 365).  He concluded that Claimant should have no difficulty standing, walking, sitting, hearing, speaking, traveling, and handling objects with her dominant hand.  (Tr. at 366-367).  However, he felt that she would experience difficulty lifting, carrying, pulling and pushing.  (Tr. at 367).  He found Claimant's mental status, memory, understanding and interaction to be normal.  Dr. Apgar concluded that Claimant was limited by lack of education. *Id.*

## VI.   **Discussion**

Claimant alleges that the ALJ erred by not finding Claimant's borderline intelligence to be a severe impairment.  She also argues that the hypothetical questions posed to the vocational experts failed to include limitations related to her borderline intelligence and IBS.  Finally, she contends that the Appeals Council erred by failing to consider and comment on the additional evidence submitted after the administrative hearings and the ALJ's decision.

## A.    Alleged Errors of the ALJ

In support of her argument that the ALJ committed error by failing to recognize the severity of her borderline intelligence, Claimant cites to *Reichenbach v. Heckler,* 808 F.2d 309 (4th Cir).   According to Claimant, this case holds that borderline intelligence is *ipso facto* a severe impairment.   (Pl. Br. at 15).   A review of the case, however, confirms that Claimant's interpretation is incorrect.   In *Reichenbach,* the Fourth Circuit Court of Appeals concluded that the ALJ had erred by not considering the claimant's "deteriorating borderline intelligence" in combination with his physical impairments when determining whether claimant had a severe impairment. *Reichenbach v. Heckler, supra* at 312.   As a result of this error, the ALJ determined that the claimant was not disabled at step two of the sequential evaluation, prior to conducting an assessment of claimant's residual functional capacity.   The Court objected to the ALJ's failure to consider the impairments in combination, which resulted in a premature determination of non-disability.   Contrary to Claimant's assertion, the Court did not arbitrarily attach a finding of severity to any IQ score, except those that met the listing in Appendix 1.[6]

In this case, the ALJ found several of Claimant's impairments to be severe. Consequently, as the Commissioner emphasizes in his brief, the issue of a premature determination that so troubled the *Reichenbach* Court is not an issue here.   The ALJ conducted a thorough assessment of Claimant's RFC, considering all of her impairments.   He then crafted his hypothetical questions to reflect the limitations

---

[6] Claimant also implicitly relies upon SSR 82-55, which she claims sets a policy that "an IQ below 80 is severe."  (Pl. Br. At 15).  In fact, SSR 82-55 was intended to enunciate the policy regarding non-severe impairments.  This Ruling stated, by way of example, that an IQ of "80 or greater in all major areas of intellectual functioning" is a non-severe impairment.   The Ruling, however, does not state that an IQ below 80 automatically constitutes a severe impairment.   In any event, SSR 82-55 is inapplicable in this case, as it has been rescinded without replacement.

attendant to those impairments, regardless of whether or not they were identified as severe or non-severe.   (Tr. at 19-24).   Certainly, substantial evidence existed in the record upon which the ALJ could conclude that the Claimant's intelligence level was not a severe impairment.   Claimant had worked in the past at semi-skilled positions, including as a waitress, without difficulty.   She reported in the application process that she had no problems with personal care; did not need reminders for appointments; drove and shopped on her own; and managed the household income.   (Tr. at 109-111).

Claimant's challenges related to the ALJ's hypothetical questions are also without merit.   The case law in this Circuit is well-settled that "to be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments." *Michael v. Astrue,* 2010 WL 697000, *14 (S.D.W.Va.), citing to *Walker v. Bowen,* 889 F.2d 47, 51 (4th Cir. 1989).   However, while the hypothetical question must fairly depict the claimant's impairments, it need only include limitations related to severe impairments and may properly omit the characteristics of non-severe impairments. *Michael v. Astrue, supra*  at *14, referencing *Benenate v. Schweiker,* 719 F.2d 291 (8th Cir. 1983).

Claimant alleges that the ALJ failed to include her intellectual impairment in the hypothetical question to the vocational expert.   Inasmuch as the ALJ did not find this impairment to be severe—a finding supported by substantial evidence—he was not required to include Claimant's borderline intelligence in his hypothetical questions to the vocational experts.   *Id.*   Nonetheless, the ALJ did include Claimant's intellectual impairment in his questions, by incorporating the functional limitations secondary to her low IQ and lack of education.   (Tr. at 415, 422-423).   The ALJ specifically asked both

vocational experts to assume that Claimant had "eighth grade reading skills, fifth grade math skills, and third grade spelling skills." (Tr. at 415, 422). Clearly, this assumption accounted for Claimant's intellectual and/or educational limitations in terms more concrete and, therefore, more useful to the vocational experts in forming their opinions, than if the ALJ had simply recited Claimant's IQ scores.

Claimant further argues that the ALJ improperly excluded limitations related to her IBS in his hypothetical question to the expert. In this Circuit, "an ALJ is afforded 'great latitude in posing hypothetical questions,'" *Koonce v. Apfel,* 1999 WL 7864, *5 (4th Cir. 1999), citing *Martinez v. Heckler,* 807 F.2d 771, 774 (9th Cir. 1896), "and need only pose questions containing the limitations substantiated by evidence of record that accurately reflect the claimant's limitations." *Miller v. Astrue,* 2010 WL 3853379, *19 (N.D.W.Va.). In the present case, the ALJ expressly adopted the findings and conclusions of the agency consultants, and especially those of Dr. Apgar, because his "opinions appear to be reasonable and consistent with the credible objective evidence of record and should adequately account for any residual symptoms and limitations associated with claimant's musculoskeletal impairment, respiratory distress, and history of irritable bowel syndrome." (Tr. at 19-20). Dr. Apgar found that Claimant suffered from irritable bowel syndrome, as well as other medical conditions, and then provided opinions on the functional limitations experienced by Claimant as a result of the constellation of these conditions. (Tr. at 365-367). For the most part, the ALJ adopted Dr. Apgar's determinations of functional limitations, with the exception that the ALJ found exertional limitations related to Claimant's ability to stand, sit and walk, which were more restrictive than those propounded by Dr. Apgar. None of the other consultants identified additional limitations related specifically to Claimant's IBS.

Moreover, the ALJ performed the appropriate two-step assessment of Claimant's subjective complaints and found that Claimant's allegations regarding the intensity and severity of her IBS symptoms were not entirely credible. The ALJ then documented his findings in detail, explaining both his rationale and the supporting evidence. (Tr. at 21-22).   Claimant directs the Court to various records documenting Claimant's history of chronic diarrhea and argues that these notes corroborate her description of the severity and intensity of her IBS symptoms.   However, the record also establishes that Claimant suffered from diarrhea for over twenty years, yet during the biggest portion of that time frame, she managed to work on a full-time basis.   Accordingly, the fact that Claimant had a history of chronic diarrhea does not answer the question of its severity.   The ALJ explained that Dr. Mailloux's records supported the conclusion that Claimant's IBS was controlled on medication. (Tr. at 21).   Likewise, the physical examinations performed by Claimant's treating physicians and the consulting examiner did not yield reports or physical findings suggestive of chronic, ongoing, and severe limitations secondary to IBS.   Claimant's abdominal complaints had decreased in the years since she filed her applications for disability.   On multiple occasions, the notes reflecting her appointments with Dr. Patil were devoid of any mention of IBS or abdominal complaints.   Based upon the absence of documented problems, the ALJ determined that Claimant's IBS was relatively stable.   *Id.*   As the Commissioner points out, Dr. Patil also prepared a functional assessment of Claimant after the ALJ's decision was drafted, and, in that assessment, she made no mention of IBS as a causative factor in Claimant's inability to work.   (Tr. at 389-391).   The lack of functional limitations attributed by Dr. Patil to IBS is particularly significant, because Dr. Patil was Claimant's primary treating physician for that condition since December 2003.    Consequently, based upon the totality of the

evidence, the Court finds that the limitations contained in the hypothetical questions posed by the ALJ fairly represented Claimant's impairments and their resulting functional limitations.  Similarly, the Court finds that the ALJ adequately explained his basis for discounting Claimant's description of her limitations related to IBS.

### B.    Alleged Errors of the Appeals Council

Claimant asserts that the Appeals Council erred in not explicitly addressing the additional evidence submitted by Claimant after the ALJ's decision.  She argues that the submitted documentation constituted "new and material" evidence that related to the alleged period of disability; accordingly, the Appeals Council was obligated to (1) consider that evidence, and (2) articulate its reason for disregarding this evidence.  (Pl. Br. at 18-19).  The Commissioner contends that Claimant's arguments are specious for two reasons.  First, the Court lacks jurisdiction to review the denial of the Appeals Council, as it was not a final decision subject to review.  The Commissioner adds that, in any event, the Appeals Council is not required to articulate specific reasons for disregarding Claimant's evidence.  (Def. Br. at 13-15).  Second, the Commissioner posits that Claimant's supplemental evidence was not new or material; therefore, neither the Appeals Council, nor the Court should consider it.  (Def. Br. at 16-18).

The Court disagrees with the Commissioner's general contention that the Court may only review supplemental evidence submitted to the Appeals Council after an initial finding is made by the Court that the evidence was "new and material."  While the Court agrees that the Appeals Council is only required to consider supplemental evidence that is new and material, the Court need not make that determination.[7]  Instead, its

---

[7] The Court need not contemplate the issue of whether the supplemental evidence was new and material, because the Appeals Council clearly considered the evidence in reaching its denial of Claimant's request for review. (Tr. at 6).

obligation is to review any evidence that is a part of the record.  *Wilkens v. Secretary,* 953 F.2d 93 (4th Cir. 1991).  In this case, the Appeals Council expressly incorporated the Medical Assessment of Ability to do Work-Related Activities prepared by Dr. Patil and the letters from the relatives and friends of Claimant and considered that evidence in arriving at its decision to deny Claimant's request for review. (Tr. at 6-9).  Therefore, the Court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner's] findings." *Wilkens v. Secretary, supra* at 96.

The Court has considered the supplemental evidence submitted by Claimant and agrees with the Appeals Council that the evidence did not provide a basis for changing the decision of the ALJ.  The only medical evidence provided by Claimant was the opinion of Dr. Patil related to Claimant's inability to engage in work-related activities. This opinion was not accompanied by an updated physical examination or by any objective medical findings.  (Tr. at 389-391).  Instead, the opinion largely referred to diagnoses and subjective complaints contained in the records that were available to the ALJ at the time of his decision.   The ALJ fully considered the medical records of Dr. Patil, as well as the subjective complaints of the Claimant, and found the physical examination and opinions of Dr. Apgar to be more persuasive on issues of severity and intensity, because he provided objective medical findings to support his conclusions.[8] (Tr. at 19-20).   The ALJ is entitled to discount the weight given to the opinion of a treating physician when that opinion is not supported by the objective medical evidence

---

[8] The Court again notes that Dr. Patil did not acknowledge Claimant's IBS and borderline intelligence as foundations for her opinions related to Claimant's restrictions.   Considering that Claimant's challenges to the Commissioner's decision rest largely on her belief that the ALJ failed to fully consider these two medical conditions, Claimant is hard-pressed to put forth a reasonable argument that Dr. Patil's opinions may have altered the ALJ's decision.

or clinical findings. *Craig v. Chater,* 76 F.3d. 585 (4th Cir. 1996). "The ALJ holds the discretion to give less weight to the testimony of the treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992). As previously discussed, the Court finds that persuasive contrary evidence exists in the record.

The remaining supplemental evidence included four letters, three from family members and one from a former co-worker. (Tr. 392-398). Social Security Ruling 06-03p provides some guidance on how the SSA uses opinions from "non-medical sources," such as neighbors, spouses, friends, and relatives, stating:

> In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

*Id.* at *6. In considering these letters, the Court observes that none of them include details that shed light on the persistence, intensity, and severity of Claimant's symptoms specific to the relevant time period at issue in this case. In the instance of Claimant's IBS, Dr. Mailloux's records substantiate that Claimant suffered from the symptoms of IBS for as long as twenty years before coming to see him. These medical records also reflect that in 2000, Claimant's symptoms were of sufficient persistence and severity to prompt her to seek dedicated medical care to address them. However, the objective medical records generated after that year substantially support the ALJ's determination that Claimant's IBS improved and stabilized upon receiving the medications originally prescribed by Dr. Mailloux and continued by Dr. Patil. The letters in evidence are silent as to the dates, or even the years, during which the writers observed the incidents

pertaining to Claimant's fecal incontinence. Moreover, to the extent that the letters reference Claimant's COPD and chronic pain syndrome, they are inconsistent with the examinations of Dr. Apgar, pertinent radiological findings, and the opinion of Dr. Lim. Accordingly, the Court finds that these letters are not of sufficient evidentiary weight to overcome a finding that the ALJ's conclusions were based on substantial evidence.

Finally, the Court recognizes that the issue of whether the Appeals Council should articulate its assessment of newly submitted evidence is unsettled in the Fourth Circuit. See *Hollar v. Commissioner of Social Security,* 194 F.3d 1304 (4th Cir. 1999)(refusing to find a duty on the part of the Appeals Council to explain its reasons for discounting the effect of new evidence on its decision to deny review) and *Thomas v. Commissioner of Soc. Sec.,* 24 Fed. Appx. 158, 2001 WL 1602103 (4th Cir. 2001)(finding that the Appeals Council must indicate its reasons).[9]   For guidance, the Court refers to 20 C.F.R. §§ 404.970 and 416.1470, which set forth the obligations of the Appeals Council in the face of new and material evidence submitted after the ALJ has conducted an administrative hearing and issued a decision.   These regulations require the Appeals Council to "evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.   It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."   20 C.F.R. §§ 404.970(b) and 416.1470(b).   The regulations do not place any duty on the Appeals Council to overtly analyze the new evidence or articulate a reason for its determination that the ALJ's action, findings, or conclusions were not contrary to

---

[9] The District Courts within the Fourth Circuit have likewise issued conflicting opinions on this issue.  See, *e.g., Sapienza v. Astrue,* 2010 WL 378204 (D.S.C.)*; Shawn v. Commisioner of Soc. Sec.,* 2010 WL 4623980 (E.D.Va.); *Bolin v. Astrue,* 2010 WL 1176570 (S.D.W.Va.); *Delawder v. Astrue,* 2009 WL 2423978 (N.D.W.Va.); *Hawker v. Barnhart,* 235 F. Supp. 2d. 445 (D. Md. 2002);

the totality of the evidence.  The Court concludes that if such a duty existed, it would have been expressly set forth in the regulations.  Accordingly, the Court finds that the Appeals Council did not err in failing to articulate specific findings relative to the new evidence submitted by Claimant.

## VII.  **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  December 15, 2010.

Cheryl A.  Eifert
United States Magistrate Judge